IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHRISTINE E. CHRISTENSEN,
     Plaintiff,

vs.                            Case No. 5:07cv154/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income benefits (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

This suit involves Plaintiff's applications for DIB and SSI, filed on or about October 22, 2003 (Tr. 52–55, 341–46).[1]   The applications were denied initially and on reconsideration, and Plaintiff appealed the denials to an administrative law judge (ALJ) (Tr. 27–29, 31–33).   An administrative hearing was held on August 16, 2006 (Tr. 363–84).   On January 5, 2007, the ALJ found that Plaintiff was "not disabled" (Tr. 15–20).   The Appeals Council denied Plaintiff's request for review on April 6, 2007, making the decision of the ALJ the final decision of the Commissioner, subject to judicial review in this court under 42 U.S.C. § 405(g) (Tr. 6–9).   *See also* Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).   This appeal followed.

II.     FINDINGS OF THE ALJ

On January 5, 2007, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15–20):

1)      Plaintiff meets the insured status requirements of the Act through December 31, 2007.

2)      Plaintiff has not engaged in substantial gainful activity since August 31, 2003, the alleged onset of disability date in each application (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3)      Plaintiff has the following severe impairments: osteoarthritis, carpal tunnel syndrome (CTS), and status post motor vehicle accident (MVA) with back and neck pain (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5)      Plaintiff has the residual functional capacity (RFC) to perform light work. Specifically, Plaintiff can lift or carry 20 pounds occasionally and 10 pounds frequently. She can sit, stand, or walk for about six hours in an eight-hour day. She is limited to occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling due to arthritis. She is precluded from climbing ladders,

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on October 16, 2007 (Docs. 14, 15).

    ropes, and scaffolds.  Plaintiff should avoid even moderate exposure to hazards due
to osteoarthritis and disorders of the spine.

6)     Plaintiff is capable of performing her past relevant work as a cashier.  This work
does not require the performances of work-related activities precluded by her RFC
(20 C.F.R. §§ 404.1565 and 416.965).

7)     Plaintiff has not been under a "disability," as defined in the Act, from August 31,
2003 through January 5, 2007, the date of the ALJ's decision (20 C.F.R. §§ 404.
1520(f) and 416.920(f)).

## III.   STANDARD OF REVIEW

    Review of the Commissioner's final decision is limited to determining whether the decision
is supported by substantial evidence from the record and was a result of the application of proper
legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may
reverse the decision of the [Commissioner] only when convinced that it is not supported by
substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan,
125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A
determination that is supported by substantial evidence may be meaningless . . . if it is coupled with
or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983),
*superseded by statute on other grounds as stated in* Elam v. Railroad Retirement Bd., 921 F.2d
1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's
decision will not be disturbed if in light of the record as a whole the decision appears to be supported
by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439;
Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla,
but not a preponderance, it is "such relevant evidence as a reasonable person would accept as
adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427,
28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206,
217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew,
reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan,
894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates
against the  Commissioner's decision, the decision must be affirmed if supported by substantial
evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen,

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.   Personal History

Plaintiff was born on December 1, 1964, and has a high school equivalency education (GED) (Tr. 52, 65).  She lives with her two minor children (Tr. 53, 89).  Plaintiff last worked as a hand packer, and before that she worked as a cashier/checker and a sand molder (Tr. 108).

Plaintiff testified that she has injuries as a result of a work-related accident and a subsequent vehicle accident (Tr. 367).  The primary problems that prevent her from working are her back and right arm (Tr. 368).  She can lift only five pounds with her right arm but ten pounds using both arms (id.).  However, she has difficulty reaching and holding things in her right hand (Tr. 369, 375).  She does not do any chores; her daughter helps her with cooking and other tasks (Tr. 369).  She can sit for up to twenty minutes before her back hurts and she has to change positions (Tr. 370).  Plaintiff spends the day watching television and trying to get comfortable (Tr. 371).  She testified that she is in constant pain and that the pain increases with activity (Tr. 375).  Plaintiff also stated that her medications make her drowsy, but nevertheless, she does not sleep well at night and must nap twice during the day (Tr. 378–79).

B.   Relevant Medical History — Physical[3]

Plaintiff had a right clavicular fracture and back pain from a four-wheeler accident on August 31, 2003 (which is the MVA noted by the ALJ).  She was diagnosed with a mild compression fracture at T-12 and a traverse process fracture at L1-2.  Treatment included analgesics, muscle relaxants, inactivity, therapy, and cervical trigger point injections (see Tr. 237).  On October 9, 2003, nerve conduction studies of the right upper extremity were normal (Tr. 240).  On October 27, 2003, it was noted that the fracture at T-12 was stable, in good alignment, and "very small" (Tr. 192).  Although Plaintiff reported lower back pain on November 10, 2003, she was advised by her physician to consider an exercise program to strengthen the muscles and to consider quitting

---

[3]Evidence relating to Plaintiff's mental health will be discussed in Part V.A, infra.

smoking, "as this tends to be associated with a higher incident of back pain" (Tr. 190).   On December 1, 2003, Plaintiff complained of pain and numbness in her right arm, but nerve conduction studies revealed no abnormality (Tr. 188).

On December 5, 2003, Plaintiff underwent an open reduction internal fixation to repair non-union of the right clavicle (*see, e.g.*, Tr. 154).   On December 9, 2003, clavicle x-rays revealed that the hardware and fracture were in excellent position (Tr. 186).   Richard M. Laubaugh, M.D., advised Plaintiff to perform passive range of motion shoulder exercises, but to avoid "vigorous activities" (*id.*).   Additionally, Dr. Laubaugh opined that Plaintiff could do "light work and one handed jobs at the present time," and she could probably return to "regular duty in 3–6 months" (*id.*).   On December 16, 2003, Dr. Laubaugh noted intact sensation over the posterior shoulder, intact biceps and triceps (he noted that the deltoid "seems" to be intact), strong pronation and supination of the forearm, good grip strength, and normal sensation to light touch throughout the arm (Tr. 185). Gentle and passive exercises were again recommended (*id.*).   On January 6, 2004, in pertinent part, Dr. Laubaugh advised Plaintiff to avoid "lifting, pushing and pulling with the right arm for six weeks post op" and then to be "somewhat careful an additional 6 weeks" (Tr. 184).   When Plaintiff next saw Dr. Laubaugh, on January 20, 2004, three tests designed to detect carpal tunnel syndrome (CTS) were all negative, and he therefore opined that Plaintiff was not "symptomatic for CTS" (Tr. 183).   Plaintiff was advised to "gradually resume lifting with her arm" (*id.*).   Finally, treatment notes from Dr. Laubaugh, dated May 13, 2004, indicate decreased sensation over the anterior deltoid to light grip strength, but Plaintiff had a strong grip, wrist extension, and flexion (Tr. 182).   X-rays of the clavicle demonstrated intact hardware (*id.*).   Plaintiff was instructed to lift no more than fifteen pounds and to work on passive shoulder motion exercises (*id.*).

Plaintiff underwent a series of objective tests between January and August 2004.   In January 2004, an MRI of the lumbar spine was normal, as were bilateral hip x-rays (Tr. 199–200, 216).   A January 2004 MRI of the cervical spine revealed a "shallow bulge at C6-7" but was otherwise unremarkable (Tr. 201).   Nerve conduction studies, performed on March 30, 2004, revealed CTS bilaterally (Tr. 202).   An EMG of the upper extremities, also performed on March 30, 2004, revealed "normal insertional activity, [and] normal interference pattern and recruitment" of muscles in the upper extremities, including the deltoid, supraspinous, and paravertebral muscles (*id.*).   "There were

no fibrillations, fasciculations or positive sharp waves.  The only abnormalities seen in the muscles were in the APB[4] bilaterally which showed denervation changes." (*id.*).

On April 1, 2004, a neurological examination revealed, in pertinent part, left upper extremity strength at 4/5 and right upper extremity strength at 3+/5 in Plaintiff's deltoids, biceps, triceps, wrist flexors, wrist extenders, and grip (Tr. 212).  Plaintiff had a normal gait, and strength in the lower extremities was noted to be "within normal limits" in all areas tested (Tr. 211).  By June, July, and August 2004, Plaintiff's lower extremity strength continued to be normal, as well as her gait, but Plaintiff's upper extremity strength and grip in all areas were now also noted to be within normal limits (Tr. 205, 207–08, 211).  Plaintiff underwent a right carpal tunnel release on July 14, 2004, after which she was noted to be "doing well" (Tr. 206–07).

A second cervical MRI, taken July 31, 2004, showed mild degenerative changes and a minimal disc bulge at C6-7, but no evidence of nerve root compression or spinal stenosis was present (Tr. 205).  An MRI of the right shoulder demonstrated diffuse tendonitis (*id.*).  The impression of Dr. Douglas L. Stringer, M.D., FACS, was: 1) neck pain, with no evidence of cervical cord or nerve root compression, 2) mild degenerative changes of the cervical spine, 3) right shoulder pain, status post right clavicular surgery, and 4) mild tendinitis of the right shoulder (*id.*).

Plaintiff saw Kamal H. Zawahry, M.D., intermittently during the time frame relevant to this appeal.  His records generally indicate treatment with analgesics and anti-inflammatory medication for shoulder, neck, and/or back pain (*see, e.g.*, Tr. 235, 238).  On one occasion, April 20, 2004, Plaintiff reported experiencing severe back pain after lifting groceries (Tr. 236).  She was treated with a trigger zone injection and prescribed Lorcet and Valium (*id.*).  On August 26, 2004, Dr. Zawahry noted that nerve conduction studies and an EMG of the upper extremities were normal (Tr. 318–19).

Plaintiff returned to Dr. Stringer on October 8, 2004, complaining of pain in her neck, right shoulder, right arm, lower back, and hip (Tr. 317).  Although Plaintiff had some tenderness to

---

[4]APB is believed to stand for "abductor pollicis brevis," a short abductor muscle of the thumb.  *See* http://www.medilexicon.com/medicaldictionary (last visited August 2, 2008).

palpation, she had good range of neck movement without pain, and Spurling's test was negative[5] (Tr. 316).   Plaintiff also had tenderness to palpation in the lower back, moderate muscle spasm, limitation of forward bending to 70% of normal, and straight leg raising caused some low back pain but no radicular symptoms (*id.*).   Plaintiff had normal grip and normal upper and lower extremity strength (*id.*).   Plaintiff reported some hip pain, and she was noted to be limping, but deep tendon reflexes were equal and symmetrical and Babinski's were negative[6] (*id.*).   In January 2005, Plaintiff reported shoulder pain as well as increasing neck pain and muscle spasm of the cervical area (Tr. 315).   Dr. Stringer noted marked tenderness to palpation of the cervical spine and both trapezius, with mild muscle spasm and myofascitis (Tr. 314).   Plaintiff's neck movement was limited to 50% of normal, and the Spurling's test caused neck pain with no radicular component (*id.*).   Otherwise, Plaintiff's physical examination was essentially unchanged from her last visit (*see* Tr. 314, 316).   Dr. Springer recommended EMG and nerve conduction studies of the upper extremities and cervical facet and trigger point injections (Tr. 313–14).

On January 18, 2005, Plaintiff underwent (what was to be the first in a series of three) cervical paravertebral nerve blocks and bilateral cervical facet injections (Tr. 312).   Following the procedure Plaintiff reported improvement, and although she still had pain her neck, there was no radicular pain (Tr. 305).   Plaintiff also noted just after the procedure that her pain decreased from a "9" to a "2," although she later had "some recurrence" of the pain, as well as occipital headaches and muscle spasm (*id.*).   On January 20, 2005, nerve conduction studies of the upper extremities were normal, but an EMG was abnormal, indicating nerve root irritation and possible radiculopathy (Tr. 308).   Plaintiff underwent a second series of nerve blocks and injections on January 26, 2005, after which she reported decreased pain and increased range of motion (Tr. 306).   The third series was performed on February 2, 2005 (Tr. 303).   Plaintiff again reported decreased pain and increased

---

[5]The Spurling's test is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain."  *See* http://www.medilexicon.com/medicaldictionary (last visited August 4, 2008).

[6]This test involves "extension of the great toe and abduction of the other toes instead of the normal flexion reflex to plantar stimulation, considered indicative of corticospinal tract involvement ("positive" Babinski)."  *See* http://www.medilexicon.com/medicaldictionary (last visited August 4, 2008).

range of motion (*id.*).  Plaintiff followed up with Dr. Stringer on March 8, 2005 (Tr. 300).  She reported "significant improvement in her neck pain" with the cervical facet and nerve block injections, noting that her pain had gone from a "10" to a "3" (*id.*).  Plaintiff had no radicular arm pain, although she  reported occasional numbness in the right hand (*id.*).  Plaintiff continued to see Dr. Stringer through July 2005, and although she continued to report some back pain and pain in her neck (*see, e.g.*, Tr. 296), a July 2005 MRI of the lumbar spine was unremarkable, with "no evidence for disc herniation, neural foraminal effacement, or nerve root impingement" (Tr. 290, 292). Plaintiff was advised by Dr. Stringer on July 19, 2005, to "continue increasing her activities" (Tr. 286).  However, following this advice, Plaintiff began "no-showing" for her appointments with Dr. Stringer.  For example, she failed to appear for appointments in October and December 2005, and she did not return to Dr. Stringer until one year later, on July 28, 2006 (*see id.*).  The following month, August 2006, Plaintiff reported no neck pain, and she was noted to have good range of neck movement (Tr. 283).

   C.  Other Information Within Plaintiff's Claim File

   Mary Seay, M.D., completed a Physical RFC Assessment on December 2, 2003 (Tr. 143–50).  She opined that Plaintiff was able to frequently lift or carry twenty-five pounds and occasionally lift or carry fifty pounds.  Plaintiff could stand, sit, or walk six hours in an eight-hour workday (Tr. 144).  Her ability to push or pull was unlimited, and no postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 144–47).

   Tom Peele, M.D., AAP, completed a Physical RFC Assessment on December 9, 2004 (Tr. 244–51).  Dr. Peele opined that Plaintiff was able to lift or carry twenty pounds occasionally and ten pounds frequently, and she could sit, stand, or walk six hours in an eight-hour workday (Tr. 245). Her ability to push or pull was unlimited, and no manipulative, visual, or communicative limitations were established (Tr. 245, 247–48).  Plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl, but she could never balance (Tr. 246).   Plaintiff was to avoid exposure to environmental hazards such as machinery or heights (Tr. 248).

   A vocational expert (VE) testified at Plaintiff's hearing before the ALJ.  The VE testified that Plaintiff's past relevant work was as a cashier checker, and it was semiskilled and performed at the light exertional level; a hand-packer of household items, which was unskilled and at the medium

exertional level as generally performed but heavy exertional level as actually performed; and a sand molder, unskilled and performed at the medium exertional level. (Tr. 380).  The VE also provided testimony in response to the ALJ's hypothetical questions for an individual with the same age, education and work experience as Plaintiff, and adopting the limitations noted by the State agency reviewers in Exhibits 12F (the report of an agency psychologist (Tr. 219–31)) and 14F (Dr. Peele's physical RFC assessment (Tr. 244–51)); the VE opined that Plaintiff could return to her past work as a cashier/ checker (Tr. 381–82).  The VE further testified that even if Plaintiff was only able to lift five pounds with her dominant upper extremity and was "dropping coffee cups, so forth," the cashier check position could still be performed (Tr. 383).  Finally, the VE testified that if Plaintiff's testimony was fully credited, specifically drowsiness due to medications resulting in two naps daily, and if Plaintiff were in constant pain, no jobs could be performed (*id.*).

V.    DISCUSSION

Plaintiff raises several issues in the instant appeal.  Plaintiff generally asserts that ALJ erred in finding her mental impairment non-severe, in determining her RFC, and in finding that she could perform light work (*see* Doc. 21).  Plaintiff further asserts that the ALJ made an erroneous credibility determination regarding her complaints of pain and erred in determining that Plaintiff could perform her past relevant work.[7]

A.    Consideration of Plaintiff's Mental Impairment

Plaintiff contends the ALJ erred in finding her mental impairment (presumably "depressive disorder") non-severe at step two (Doc. 21 at 13–16).  Before analyzing whether the ALJ erred in this regard, it is necessary to first review the evidence of record relating to Plaintiff's mental health, which is quite scant, and which is fully summarized as follows.

1.    Evidence Relating to Plaintiff's Mental Health

Psychologist Jane F. Cormier, Ph.D., completed a Psychiatric Review Technique Form (PRTF) on January 30, 2004 (Tr. 167–80).  She opined that Plaintiff had no medically determinable mental impairment at that time (Tr. 167).  Dr. Cormier stated that Plaintiff "has a full range of [activities of daily living]," noting that Plaintiff cooks, drives, cleans, does household chores, shops,

_____

[7]For organizational purposes, Plaintiff arguments will be rearranged and/or combined.

and has no problems with concentration or getting along with others (Tr. 179). She specifically noted that Plaintiff's only restrictions were those related to pain and her physical condition (*id.*).

On August 30, 2004, psychologist Clell C. Warriner, Ph.D., evaluated Plaintiff at the request of the Division of Disability Determinations (DDS) (Tr. 217–18). Plaintiff advised Dr. Warriner that she had worked for most of her life, but she became unemployed in December 2002 and began receiving unemployment compensation shortly thereafter (Tr. 217). Plaintiff reported that the following year she was involved in a significant recreational vehicle accident, which resulted in back and clavicle injuries (*id.*). Dr. Warriner noted, "[t]o say that [Plaintiff] is upset concerning her limitations and inability to work or function properly [as a result of the accident] is a significant understatement" (*id.*). He also noted that although Plaintiff characterized herself as "strong and independent," she "cried copiously as she recited her disappointment and self-disapproval concerning her present dependant situation" (Tr. 218). Plaintiff acknowledged that she had never received any type of mental health treatment, but she stated that she considered suicide during the early stages of recovery from her accident (*id.*). Plaintiff was oriented times three, but she made two errors in reciting serial threes, neither of which she recognized, and Dr. Warriner attributed the errors to Plaintiff's "rather substantial medication regime[n]" (*id.*). Plaintiff was diagnosed with depressive disorder secondary to a medical condition and chronic pain disorder, moderate, and he assessed Plaintiff with a Global Assessment of Functioning (GAF) score of 62 (*id.*).[8]

Psychologist J. Patrick Peterson, Ph.D., completed a PRTF on September 14, 2004 (Tr. 219–31). He opined that Plaintiff has a non-severe mental impairment (adjustment reaction with depressive features), which does not meet the criteria of a listed impairment and results in no functional limitations other than mild difficulties in maintaining concentration, persistence, or pace (Tr. 219, 222, 229). Dr. Peterson noted Plaintiff's lack of mental health treatment, and he stated that the "findings of [Dr. Warriner's consultative examination] are contraindicative of any diagnosable

---

[8]GAF is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

mental [disorder] beyond mild Adjustment Reaction" (Tr. 231).   Like Dr. Cormier, he noted Plaintiff's activities of daily living and her ability to "effectively handle[] a normal array of routine personal/household responsibilities" (*id.*).  He also reiterated that Plaintiff's condition is non-severe, and he noted that Plaintiff "remains capable of adequate functioning in a full range of routine day-to-day behavior within her physical & motivational/volitional parameters" (*id.*).

        2.     Evaluation of Mental Impairments

     At step two of the sequential evaluation process, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her physical or mental ability to perform "basic work activities."  *See* 20 C.F.R. §§ 404.1520(c) 404.1521(a).  Basic work activities include: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and capacities for seeing, hearing, and speaking; as well as <u>mental functions</u> such as understanding, carrying out, and remembering simple instructions; the use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).  An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  <u>Brady v. Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984); *see also* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account").  Although the claimant carries the burden at step two, the burden is mild.  <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.").  A claimant need only show that "her impairment is not so slight and its effect is not so minimal."  *Id.*

     When evaluating a mental impairment, the familiar five-step sequential evaluation is used, including the evaluation at step two, but the Regulations additionally require that mental

impairments be evaluated in accordance with 20 C.F.R. § 404.1520a,[9] which describes a "special technique" requiring the ALJ to first evaluate "your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings . . . ."  20 C.F.R. § 404.1520a(b)(1).  The ALJ must then evaluate the degree of functional loss resulting from the impairment in the four areas of:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c).  The regulations set forth a five-point scale to rate the degree of limitation in the first three functional areas (none, mild, moderate, marked, and extreme) and a four-point scale to rate the degree of limitation in the fourth functional area (none, one or two, three, four or more). If the degree of limitation in the first three areas is "none" or "mild," and "none" in the fourth area, an ALJ may properly find that a mental impairment is non-severe, provided there is no evidence to the contrary.  *See* 20 C.F.R. § 404.1520a(d)(1).  If an ALJ finds a mental impairment severe, however, the ALJ must then determine whether the impairment meets or is equal to a listed mental impairment.  Finally, the ALJ's written decision must incorporate pertinent findings and conclusions based on use of the special technique, and the ALJ's decision "must include a specific finding as to the degree of limitation in each of the functional areas."  20 C.F.R. § 404.1520a(e)(2).

### 3.       Analysis

In the instant case, the ALJ found that Plaintiff had no severe mental impairment, but his decision does not clearly reflect use of the "special technique."  In discussing <u>all</u> of the evidence regarding Plaintiff's mental impairment and in determining that it was non-severe, the ALJ stated <u>only</u> as follows:

> The medical evidence indicates that [Plaintiff's] mental impairments, as considered under section 12.04 of the Listings, results [sic] in no restriction of activities of daily living and no difficulties in maintaining social functioning.  She has experienced mild deficiencies of concentration, persistence, and pace, and no repeated episode of decompensation, each of extended duration.

---

[9]The parallel provision for SSI claims is § 416.920a.

(Tr. 17–18) (hereafter the "ALJ's quote").

Initially, the ALJ's quote is contained within his step three discussion, not his step two discussion (*see id.*).  Indeed, there is no mention of Plaintiff's mental impairment(s) at step two (*see* Tr. 17).  Thus, to uphold the ALJ's findings, the court would have to first assume that the ALJ's quote was inadvertently inserted in the step three discussion instead of the step two discussion.  Next, the court would have to construe the ALJ's quote as a finding that a medically determinable mental impairment exits(s), which is implicit in the ALJ's quote, but the nature of the impairment is unknown (i.e., depression and/or chronic pain disorder, as Dr. Warriner opined, or an adjustment disorder, as Dr. Peterson opined).  Furthermore, the ALJ failed to indicate which evidence he relied on in making his findings.[10]

As noted above, at step two the ALJ was first required to evaluate Plaintiff's pertinent symptoms, signs, and laboratory findings to determine whether she has a medically determinable mental impairment(s).  20 C.F.R. § 404.1520a(b)(1).  Here, the ALJ failed to consider "pertinent" findings because he disregarded altogether the opinions of Dr. Warriner (neither he nor his opinions are mentioned anywhere in the ALJ's decision).  *See id.*   This omission is especially problematic because the ALJ appears to have considered and adopted the opinions of Dr. Peterson, a non-examining psychologist, without considering the opinion of Dr. Warriner, an examining psychologist, whose opinion should have normally been given greater weight.  *See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining (the opinions of examiners are given more weight than a non-examining source); treatment relationship (treating sources are given more weight), including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

---

[10]The ALJ's quote, and findings therein, appear to be based upon the opinions of Dr. Peterson because they are consistent with his opinions.  Moreover, in determining that Plaintiff could return to her previous work, the ALJ relied on the testimony of the VE, who took into account the opinions on Exhibit 12F (Dr. Peterson's PRTF) (*see* Tr. 219–31, 381–82).  However, the ALJ did not specifically indicate that his determinations were based on the opinions of Dr. Peterson.

While acknowledging that the ALJ entirely failed to mention Dr. Warriner's opinion, the Commissioner asserts, essentially, that this amounted to harmless error because Dr. Warriner's opinion is consistent with the ALJ's findings, and the ALJ is not required to specifically mention every piece of evidence (Doc. 26 at 16).  The Commissioner notes:

> [T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical conditions as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (quoting Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (internal quotation omitted).

(Doc. 26 at 16).

The Commissioner's argument is unpersuasive.  Although the ALJ is not required to "specifically refer to every piece of evidence," the instant case is unlike Dyer.  In Dyer the ALJ failed to expressly reference the claimant's taking of Lortab, which he had taken on only one occasion.  Dyer, 395 F.3d at 1211.  The court concluded that the ALJ did not err because the Lortab was taken in connection with an acute back injury from an incident at work and was unrelated to the claimant's "long-term and subjective complaints of neck pain in connection with his application for disability."  Id.  Here, although the record is not replete with evidence relating to Plaintiff's mental impairment, the ALJ barely mentioned the evidence and failed to explain his findings relating to it.  While this court may reasonably conclude that the ALJ adopted the findings of Dr. Peterson, the ALJ provided no explanation for his decision and failed to mention the results of an examining psychologist's evaluation, whose opinion was directly relevant to Plaintiff's claim.  Indeed, it was the DDS that referred Plaintiff to Dr. Warriner for an opinion.

Moreover, the Commissioner has not rebutted Plaintiff's contention that the ALJ failed to follow the "special technique" (see Doc. 21 at 13; Doc. 26 at 16).  Although the Commissioner asserts that the ALJ did not err, citing 20 C.F.R. §§ 404.1520a, 416.920a, the ALJ did not reference either provision in his decision (see Tr. 15–20; Doc. 26 at 16).  A simple failure to reference the pertinent provision(s) would not warrant reversal if it was evident that the ALJ applied the appropriate regulation.  Here, however, it is not evident that the ALJ was aware of and applied the special technique.  In other words, the ALJ's written decision does not incorporate pertinent findings and conclusions based on use of the special technique as required by 20 C.F.R. § 404.1520a(e)(2).

In these circumstances, it matters not whether Dr. Warriner's opinion is consistent with the ALJ's finding that Plaintiff has a non-severe mental impairment.  The limited role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts.  Thus, although the overall record may indeed support the ALJ's ultimate finding that Plaintiff has no severe mental impairment, the undersigned simply cannot determine whether the finding was the result of the application of proper legal standards, specifically, use of the "special technique" and proper consideration of the examining and non-examining psychologists' opinions.  *See* Carnes, 936 F.2d at 1218 (this court may reverse the decision below "only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied") (emphasis added); Boyd, 704 F.2d at 1209 ("A determination that is supported by substantial evidence may be meaningless, however, if it is coupled with or derived from faulty legal principles").

Because of the court's limited role, the general rule is to reverse and remand for additional proceedings when errors occur.  *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir.1991).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); Elam, 921 F.2d at 1216–17 (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

Here, the cumulative effect of the evidence relating to Plaintiff's mental impairment(s) is far from establishing disability "without any doubt," and a remand for an award of benefits is therefore inappropriate.  Instead, this case should be remanded with directions to properly consider Plaintiff's mental impairments.

B.      Plaintiff's Complaints of Pain

The ALJ found that Plaintiff's complaints were less than fully credible (Tr.  19).  Plaintiff contends that this finding is erroneous because it is not supported by the record and fails to comply with the Eleventh Circuit's pain standard (Doc. 21 at 19).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam, 921 F.2d 1210 at 1216; Holt, 921 F.2d at 1223; Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to

do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054); Holt, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer, 395 F.3d at 1210 (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[11]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, 761 F.2d at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

---

[11]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

In the instant case, the court first notes that the ALJ specifically referenced § 404.1529 (Tr. 18).  He also acknowledged the existence of underlying medical conditions, specifically, osteo-arthritis, CTS, and status post MVA with back and neck pain; indeed, he found each of these conditions to be severe impairments (*see* Tr. 17).  In discounting Plaintiff's allegations, however, the ALJ noted that the "longitudinal medical evidence of record does not fully support [Plaintiff's] allegations of disability" (Tr. 18).  He also noted, similarly, that the "evidence of record" does not support Plaintiff's statements "concerning the intensity, persistence and limiting effects" of the symptoms caused by her impairments (Tr. 19).  Further, the ALJ provided reasons for finding Plaintiff less than fully credible.

In pertinent part the ALJ noted the results of objective tests, such as the clavicle x-rays following Plaintiff's surgery, which revealed intact hardware, as well as Plaintiff's MRIs and nerve conduction studies (*see* Tr. 18–19).  Moreover, although Plaintiff had an abnormal EMG in January 2005, the ALJ correctly observed that nerve blocks and injections resulted in significant improvement; that is, Plaintiff reported that her pain had decreased from a ten to a three on a ten-point scale (Tr. 19).  Furthermore, at Plaintiff's last visit with Dr. Stringer, in August 2006, she reported no neck pain and was noted to have good range of neck movement (Tr. 283).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted).

In further discrediting Plaintiff's complaints, the ALJ noted that Plaintiff's physicians offered opinions that were inconsistent with Plaintiff's allegations.  For example, although Plaintiff claimed she could not lift a gallon of milk (Tr. 100), the ALJ noted Dr. Laubaugh's opinion that Plaintiff could lift up to fifteen pounds (Tr. 16, 182).  Dr. Laubaugh also advised Plaintiff to work on passive shoulder exercises (Tr. 182), and he believed Plaintiff was able to return to light work immediately following her surgery and that she would be able to return to "regular duty" work within three to six months of her surgery (*see* Tr. 186).  It is significant that Plaintiff's physicians found no limitations consistent with disability.  *See* Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled").  It is also significant that

Plaintiff missed appointments with Dr. Stringer and failed to return to his office for over one year during the period under adjudication.  *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).

Next, the ALJ noted that Plaintiff's back pain had been treated conservatively with anti-inflammatory medications (Tr. 19).  This statement may not be not fully accurate.  At times Plaintiff was prescribed "analgesics" and "muscle relaxants" for back pain (*see, e.g.*, Tr. 237), but at other times she was prescribed stronger pain medication, such as Lortab and MS Contin (*see, e.g.*, Tr. 153, 259).[12]  Nevertheless, regardless of the type of medication prescribed for Plaintiff's back pain, the record supports a finding that lumbar facet injections and back pain medication generally controlled her pain and permitted Plaintiff to increase her physical activity (*see, e.g.*, Tr. 264, 266).  Thus, even if the ALJ misstated the evidence, it does not appear to warrant reversal, in and of itself, because the point of the ALJ's statement was that treatment for Plaintiff's back was generally conservative and generally successful, and his point is supported by the record.

Thus, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's testimony regarding her subjective complaints, and because the ALJ's credibility finding is largely supported by substantial evidence on the record as a whole, the ALJ's credibility finding should be affirmed.

However, in light of the recommendation that this case be remanded for additional administrative proceedings on other grounds, it is further recommended that upon remand the ALJ clarify matters related to Plaintiff's use of pain medications.  As previously noted, although the ALJ correctly noted that Plaintiff was prescribed relatively mild medications for back pain, she also was prescribed stronger pain medications for back and/or other pain.  Thus, the ALJ should clarify which medication Plaintiff took for which ailment, how often she took these medications, and whether she took the medications on a long-term or ongoing basis.  Further, the ALJ should specifically address

---

[12]Because Plaintiff often complained of pain in more than one area, it is difficult to determine precisely which pain medication was prescribed for which ailment.

whether the side-effects of those medications, if any, would affect Plaintiff's ability to return to work.  In considering this issue, the ALJ should take note of, and clarify, discrepancies in the record on this issue.  For example, Plaintiff reported on September 15, 2005 and November 4, 2005, that she had no side-effects from her medications (Tr. 264, 266), but she testified before the ALJ that her medications made her drowsy (Tr. 378).[13]  Additionally, Plaintiff was warned by Dr. Stringer not to drive or work when she took certain medications (Tr. 138), and Dr. Warriner thought that Plaintiff's medication interfered with her ability to perform serial threes (Tr. 218); thus, the ALJ's decision should address these opinions.

     C.     Plaintiff's Remaining Grounds for Relief

Because the ALJ will have to determine anew whether Plaintiff is disabled, it is unnecessary to fully analyze Plaintiff's remaining contentions.  The ALJ should be aware, however, of Plaintiff's remaining contentions in the event he again concludes that Plaintiff can return to her past work as a cashier.  First, Plaintiff contends that the ALJ's finding that Plaintiff is credible "to the extent she would experience pain with . . . prolonged periods of walking or standing" (Tr. 19–20) is inconsistent with his finding that Plaintiff can perform light work, because light work requires standing or walking for up to six hours and does not necessarily permit alternating between sitting and standing (Doc. 21 at 16).  Plaintiff also contends that the ALJ erred by first finding Plaintiff's arthritis, CTS, and back and neck pain severe, but then including no manipulative or reaching limitations in either the RFC or the hypothetical questions of the VE.  The undersigned takes no position on these remaining issues but recommends that upon remand they be brought to the attention of the ALJ, so they can be addressed at that level of review (if relevant to the decision made upon remand).

VI.     CONCLUSION

---

[13]Other than summarizing Plaintiff's testimony that she "takes 15 medications that cause drowsiness," the ALJ's opinion does not specifically discuss medication side-effects.  When a claimant has not complained of side-effects, and the record contains no complaints of side-effects to treating physicians, there is substantial evidence to support a finding that side-effects are not a significant problem.  See Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990).  See also Holley v. Chater, 931 F. Supp. 840, 850 (S.D. Fla. 1996) (when the sole evidence of side-effects is a claimant's testimony that medication makes him "dizzy and drowsy," such "scant evidence" is insufficient to support a finding of disability).  Here, Plaintiff specifically testified that her medications made her drowsy, but on at least two different occasions she told her physician that she experienced no side-effects.  The undersigned need not decide whether the ALJ erred in failing to discuss medication side-effects under these circumstances, as other grounds for remand exist.

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed.  *See* 42 U.S.C. § 405(g); Foote, 67 F.3d at1556 (remanding for additional administrative proceedings).

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file

At Pensacola, Florida this 6th day of August 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**